19948

The STATE, Respondent, v. Robert Esley SEAY, Appellant
(211 S. E. (2d) 649)

*Messrs. Julius B. Aiken* and *William J. Barnes,* of Green-
ville, *for Appellant,*

*Messrs. Daniel R. McLeod, Atty. Gen., Robert M. Ariail, Asst. Atty. Gen., and Richard P. Wilson, Staff Atty., of*

Columbia, and *C. Victor Pyle, Sol.,* of Greenville, *for Respondent,*

January 27, 1975.

LITTLEJOHN, Justice:

Defendant-Appellant, Seay, was convicted by a jury of failing to stop his moter vehicle after being signaled by the siren of a law enforcement vehicle in violation of Section 46-359, 1973 supplement of the 1962 Code. He has appealed.

The statute involved in pertinent part reads as follows:

"§ 46-359. Failure to stop motor vehicle when signaled by officer.—It shall be unlawful for any motor vehicle driver, while driving on any road, street or highway of the State, to fail to stop when signaled by any law-enforcement vehicle by means of a siren or flashing light. *Any attempt to increase the speed of a vehicle or in other manner avoid the pursuing law-enforcement vehicle when signaled by a siren or flashing light shall constitute prima facie evidence of a violation of this section. Failure to see the flashing light or hear the siren shall not excuse a failure to stop when the distance between the vehicles and other road conditions are such that it would be reasonable for a driver to hear or see the signals from the law-enforcement vehicle. . . ."* (Emphasis added.)

Seay submits that the lower court should have directed a verdict in his favor. A review of the evidence is necessary for a ruling on this question.

On April 25, 1973, about 5 o'clock in the afternoon, Major Butler of the Greenville Sheriff's Department was proceeding along Poinsett Highway, a four lane roadway, in a law enforcement vehicle. It had no identifying insignia or blue light, but was equipped with an electronic siren. A vehicle driven by Seay entered the Poinsett Highway from the west and pulled up alongside Major Butler's vehicle and to the left thereof. The Seay-driven vehicle had a Mr. Howard (a large man later found to be drunk) on the front seat and a Mr. Morris, who owned the car, on the rear seat.

As the vehicles came alongside each other Howard mouthed what appeared to Major Butler to be an obscenity. Major Butler testified that he reached in his pocket, took out his badge, blew his horn to attract Seay's attention and held up the badge and motioned the driver to pull over to the side of the road. Seay immediately accelerated the car. Major Butler said that upon such acceleration he "immediately turned the electric siren on and began to pursue the car." Upon being asked how close to the automobile he was at the time the siren was turned on, he responded, "Probably twenty feet behind the automobile at that time." He further estimated that the Seay automobile accelerated "to approximately 85 or 90 miles per hour. . . . I do know that he drove at such a speed that I dared not keep up with him, . . ." Major Butler said that the car continued through an intersection without stopping and turned onto the Old Buncombe Road. He gave chase, and related:

"[D]uring this time there were automobiles on the road, and stopping as this car came toward them. I don't know what significance this holds other than I felt like these cars heard my siren as I was approaching, and they were pulling over because there were cars pulling over in front of him."

In the meantime Major Butler had radioed ahead and Officer Abercrombie in Travelers Rest had set up a road block and turned on the blue light of his police car. About 15 to 20 or 25 minutes after Officer Abercrombie had re-

ceived the message, both Seay and Major Butler arrived on the scene.

It developed that Seay was driving while his license was under suspension, and the passenger (Howard) on the front seat was drunk. Seay plead guilty to driving under suspension and to reckless driving, and Howard plead guilty to public drunkenness. In addition, the charge involved in this case was made against Seay.

Morris, who owned the car and was a passenger on the back seat, and Seay, who was driving the car, testified before the jury. They explained Howard's failure to testify by stating that he had been so drunk his recollection of the incident was significantly limited.

It was Morris' testimony that he did not hear Major Butler blow his horn before the chase and never heard the siren during the chase.

It was Seay's testimony that he did not hear the horn blow, but that he did hear a siren in the far distance but was unaware of the fact that anyone was signaling him to stop.

It is a fair summary to say that both these witnesses contend that they were entirely oblivious to the fact that Major Butler was in pursuit of the car.

Both Morris and Seay testified that Howard was drunk and had been cursing and causing trouble for some time. They were attempting to get him out of the car.

We agree with the trial judge who ruled that the evidence was sufficient to support the conviction. Accordingly the exception is overruled.

Seay asks us to reverse the conviction because the judge's charge of §§ 46-581 and 46-216 "could well have confused the jury." Those sections read as follows:

"§ 46-581. Horns and warning devices.—Every motor vehicle when operated upon a highway shall be equipped

with a horn in good working order and capable of emitting sound audible under normal conditions from a distance of not less than two hundred feet, but no horn or other warning device shall emit an unreasonably loud or harsh sound or whistle. No vehicle other than an authorized emergency vehicle shall be equipped with nor shall any person use upon any such vehicle any siren, whistle or bell."

"§ 46-216. Authorized emergency vehicle.—'*Authorized emergency vehicles*' are vehicles of the *Fire Department* (fire patrol), police vehicles and such ambulances and emergency vehicles of municipal departments or public service corporations as are designated or authorized by the Department or the chief of police of an incorporated municipality."

Seay's counsel, in cross-examining Officer Abercrombie, had emphasized the fact that people other than officers sometimes have sirens on their vehicles. The charge became relevant in the light of this testimony. But independent of the testimony the reading of these two statutes to the jury could not have prejudiced the defendant's case such that it might be said that he did not receive a fair trial.

Seay alleges error on the part of the trial judge in refusing to charge Section 46-583. It reads as follows: "Any authorized emergency vehicle may be equipped with a siren, whistle or bell capable of emitting sound audible under normal conditions from a distance of not less than five hundred feet and of a type approved by the Department, but such siren shall not be used except when such vehicle is operated in response to an emergency call or in the *immediate pursuit* of an actual or suspected violator of the law, in which latter event the driver of such vehicle shall sound such siren when necessary to warn pedestrians and other drivers of the approach thereof."

Failure to charge this section did not deny Seay a fair trial. This Court held in *State v. Hoffman*, 257 S. C. 461, 186 S. E. (2d) 421 (1972):

"In order to establish a violation of Section 46-359 of the Code (Blue Light Law), according to the plain meaning of

the statute, the State must show (1) that the defendant was driving a motor vehicle; (2) that he was driving it on a road, street or highway of this State; (3) that he was signaled to stop by a law-enforcement vehicle by means of a siren or flashing light; and (4) that he did not stop. *The statute does not make a violation of another law by the defendant prior to being signaled to stop, an element of the offense created by Section 46-359."* (Emphasis added.)

The signal requiring a motorist to stop may be given by way of a siren or a flashing light, but both are not required. It is common knowledge that unmarked cars do patrol the highways and, as a matter of fact, signs appear all along public roads of this State indicating "unmarked cars patrolling."

There was no error on the part of the lower court in failure of the judge to send the jury to view the unmarked vehicle driven by Major Butler. Counsel for Mr. Seay described the vehicle, "It is just an ordinary, run-of-the-mill, prosaic automobile". We are unable to see how the exercise of the judge's discretion in this regard denied Seay a fair trial.

A new trial is not required because Major Butler was permitted to repeat the obscenity he believed Seay's drunken passenger to have uttered. Testimony of Howard's two companions (Morris and Seay), to the effect that he had been using vile language all day, lends credence to the Major's conviction that he was indeed uttering just what the Major thought he was saying. The admissibility of this evidence was a discretionary matter for the trial judge. We find no error.

Affirmed.

Moss, C. J., concurs.

Brailsford, J., concurs in result.

Lewis and Bussey, JJ., dissent.

Brailsford, Justice (concurring):

Being unconvinced that appellant has met the burden of establishing a reasonable probability that his right to a fair trial was prejudiced by any error assigned, I concur in the result of the opinion of Justice Littlejohn.

BUSSEY, Justice (dissenting) :

While in agreement that the evidence was quite sufficient to support the conviction of the defendant-appellant, I am convinced that there was prejudicial error which should entitle the defendant to a new trial. The key factual issue in the case was whether Seay knew or had any reason to believe that he was being signalled to stop by a "law enforcement vehicle." Such being the key issue, further recitation of facts disclosed by the record is indicated to better demonstrate wherein I think there was prejudicial error.

At about 5 o'clock on the afternoon of April 25, 1973 Major Butler of the Greenville County Sheriff's Department was proceeding in a northerly direction on Poinsett Highway, a four lane highway, driving an automobile which bore no insignia or marking whatsoever indicating such to be a law enforcement vehicle. Major Butler was dressed in civilian clothes and wearing no badge. The automobile was equipped with an inside electronic siren, but had no blue or other flashing light. He was proceeding in the eastern or curb lane. A vehicle driven by the defendant Seay entered Poinsett Highway from the west, and turned in a northerly direction into the lane immediately to the left or west of Major Butler's vehicle. The vehicle operated by the defendant had a passenger on the rear seat and another on the right front seat, who was a man of rather large stature and who, as it later developed, was intoxicated. As the Seay vehicle entered the lane next to that occupied by Major Butler the front seat passenger, according to Butler, looked at Butler and mouthed what appeared to Butler to be an obscenity. Thereupon, according to Butler, he reached in his pocket, took out his badge, blew his horn to attract the attention of the occupants of the Seay automobile, held up his badge and motioned to them to pull over to the side of

the road. According to Butler, the Seay car immediately accelerated whereupon Butler turned on his electronic siren and gave chase but was unsuccessful in overtaking the Seay automobile which was stopped some time later in Travelers Rest, several miles away, by another police officer who unlike Butler had a blue light. When stopped, Seay was driving perfectly normally, promptly stopped for the officer and his attitude was excellent.

Seay denied any knowledge of having been signalled to stop by Butler; admitted having heard a siren but testified that such sounded like it was in the distance and that the radio in the car driven by him was playing. The two vehicles were proceeding at about 40 m. p. h., and abreast, when Butler testified that he first tried to signal Seay by hand, but the Seay vehicle was somewhat ahead of the Butler vehicle when he first sounded his siren. When Butler first sought to stop the Seay vehicle he clearly was not seeking to apprehend, or in pursuit of, a suspected or known violator of the law. He testified, *inter alia,* "having observed this (alleged obscenity) my only intent in stopping the car was merely to have a word with the gentleman to see if he knew me and if there was any trouble that he may have or word he may have to say to me. So with this thought in mind I pulled up behind the car, * * *."

\* \* \*

"Q. And what law did the passenger of that automobile violate, if he, as you say, mouthed at you?

"A. As far as violating a law is concerned, I don't know of any law that he violated. It was simply the mouthing of something that would have been an affront to anyone and it was to me, and so I wished to stop the car and see just who that person was, whether there was anything he wanted to say to me that I wasn't aware of, and I wished to talk to him for that reason.

"Q. You had no complaint against the driver of that car at that point?

"A. No, sir, I did not."

\* \* \*

Over the strenuous objection of the defendant the court permitted Major Butler to testify, in response to a question by the prosecution that the words which the passenger appeared to have mouthed to Butler were "Mother f****r". Admittedly the glasses of both automobiles were up. Whatever the passenger said was inaudible to Butler and he allegedly recognized the obscenity by reading the passenger's lips. His Honor ruled that this evidence was admissible as it "would go to the issue of whether there was notice to the defendant." Just how this particular obscenity could have tended to put the defendant on notice that the vehicle along side him was a law enforcement vehicle occupied by a law enforcement officer who would some moments later attempt to stop his vehicle is certainly not readily apparent. The record reflects that there were a number of ladies on the jury and the admission of this vile utterance, the precise nature of which was completely irrelevant, could serve no other purpose than to prejudice the defendant in the eyes of the jury. In our view His Honor should have disallowed it as being totally irrelevant.

As already mentioned, the key factual issue in this case was whether Seay knew or had any reason to believe that he was being signalled to stop by a siren on a "law enforcement vehicle." Butler did not know any of the occupants of the Seay vehicle and there is no evidence that he was known to any of them. In the course of the cross-examination of the State's witnesses, evidence was adduced that many vehicles other than law enforcement vehicles are equipped with sirens, including some vehicles not lawfully authorized to use sirens. Over the objection of the defendant the court charged code section 46-581, which prohibits the use of sirens on other than "authorized emergency vehicles" and section 46-216 which defines the term "authorized emergency vehicles."

The applicability of these two code sections, if any, to the instant case is not readily apparent. There is no contention by the defense that the siren upon Butler's vehicle was

an unlawful one; the issue was simply whether Seay knew or had reason to believe that the Butler vehicle was a law enforcement vehicle. The indictment was captioned "Failure to stop for an emergency vehicle", although the charge in the body of the indictment was failure to stop for a law enforcement vehicle. Under all of the circumstances, the charge of these two sections could well have confused the jury, leading the members thereof to think that the failure to stop for any siren, whether or not on a law enforcement vehicle, constituted a penal offense.

Upon completion of the charge the jury was sent to lunch and upon its return, but before it started deliberation, the defendant requested that His Honor charge the jury section 46-583 of the Code which in pertinent part reads as follows:

"Any authorized emergency vehicle may be equipped with a siren * * * but such siren shall not be used except when such vehicle is * * * in the immediate pursuit of an actual or suspected violator of the law * * *."

His Honor denied the request on the ground that such was not timely. It is true that the request was somewhat late but, as counsel points out, the charging of this particular section did not become so important until the other code sections had been charged by His Honor over the objection of the defendant. The jury had not yet begun its deliberation, and we think that the charge was quite appropriate and relevant and that His Honor should have granted the request.

It is, of course, true that the violation of another law by a defendant, prior to being signalled to stop, is not an element of the offense here charged. See *State v. Hoffman*, 257 S. C. 461, 186 S. E. (2d) 421; *State v. Cox*, 258 S. C. 114, 187 S. E. (2d) 525. But under the circumstances of this case the fact that Butler was not in the immediate pursuit of a suspected or actual violator of the law is a circumstance which is quite relevant on the issue of whether or not the defendant knew or had any reason to believe that

he was being signalled to stop by a law enforcement officer in a law enforcement vehicle.

In negligence cases it is a well settled proposition of law that everyone has the right to assume that every other person will obey the law, and in the absence of a reasonable ground to think otherwise is entitled to act upon the assumption that others will observe the law. The right to rely upon such assumption does not relieve one of the duty of exercising due care, but does entitle one to have one's conduct judged in the light of such assumption. *Abeles v. Great Atlantic & Pacific Tea Co.*, 244 S. C. 508, 137 S. E. (2d) 604; *Beverly v. Sarvis,* 246 S. C. 470, 144 S. E. (2d) 220; *Kimbrell v. Bi-Lo, Inc.*, 248 S. C. 365, 150 S. E. (2d) 79; *Poole v. Southern Ry. Co.*, 250 S. C. 213, 157 S. E. (2d) 175.

While the author is aware of no criminal case in which the foregoing principle has been applied there is all the more reason why one should be entitled to rely upon such an assumption in a criminal case since the burden is upon the State to prove guilt beyond a reasonable doubt. Certainly a motorist upon the highway should be entitled to assume, in the absence of reasonable notice to the contrary, that no law enforcement officer would use a siren in violation of law. While such an assumption, of course, does not relieve the motorist of the duty to use due diligence to himself observe the law, he should be entitled to have his conduct judged in the light of such assumption. Here, Seay admittedly heard the siren, but in judging his conduct as to whether he knew, or had any reason to believe that the siren was coming from a law enforcement vehicle and the signal intended for him, he was entitled to have his conduct judged in the light of the presumption, in the absence of reasonable ground to think otherwise, that no law enforcement officer would act in violation of the law.

At the conclusion of the evidence defendant's counsel requested the court to send the jury to view the automobile

driven by Major Butler at the time, which car was parked downstairs near the court house. This request was denied. The record indicates that there is, to say the least, a serious question as to whether or not His Honor abused his discretion in denying such a request. While this denial was not, alone, necessarily prejudicial error requiring a new trial, I am of the view that such request should not have been denied under the circumstances. A view of the automobile, its window glasses, etc., could well have been of assistance to the jury in determining what opportunity, if any, Seay had to observe Major Butler, when, according to his testimony, he was attempting to display his badge and signal Seay to stop.

Being of the view that as a result of prejudicial errors the appellant was not accorded a fair trial, I would reverse the judgment below and remand the case for a new trial.

LEWIS, J., concurs.